# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
VELDA COWAN,                      )
                                  )
                  Plaintiff,      )
                                  )
         v.                       )        1:21CV196
                                  )
KILOLO KIJAKAZI,                  )
Acting Commissioner of Social     )
Security,                         )
                                  )
                  Defendant.¹     )
```

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Velda Cowan, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 16; see also Docket Entry 14 (Plaintiff's Memorandum); Docket Entry 17 (Defendant's Memorandum). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 156-59), alleging a disability onset date of December 14, 2018 (see Tr. 158). Upon denial of that application initially (Tr. 59-77, 94-97) and on reconsideration (Tr. 78-93, 101-05), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 106-07). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 38-58.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 18-32.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 154-55, 307), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2022.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since December 14, 2018, the alleged onset date.
>
> . . .
>
> 3. [Plaintiff] has the following severe impairments: asthma, status-post recurrent pulmonary embolism and nodules, rheumatoid arthritis (RA), fibromyalgia, degenerative disc disease of the cervical and lumbar spine with spondylolisthesis and radiculopathy, status-post 2015 lumbar spine surgery, obesity, depression, and anxiety.
>
> . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals

2

the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except as follows. She can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She can frequently stoop, kneel, and crouch, but she can never crawl. She must avoid concentrated exposure to extreme heat, extreme cold, humidity, fumes, odors, dusts, gases, and poor ventilation. She must avoid concentrated exposure to hazards. She can perform unskilled work of a routine and repetitive nature.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from December 14, 2018, through the date of this decision.

(Tr. 23-32 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely

limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981).
Even given those limitations, the Court should remand this case for
further administrative proceedings.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
<u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).  Instead,
the Court "must uphold the factual findings of the ALJ if they are
supported by substantial evidence and were reached through
application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561
(internal brackets and quotation marks omitted).  "Substantial
evidence means 'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>,
993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402
U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla
of evidence but may be somewhat less than a preponderance." <u>Mastro
v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal
quotation marks omitted).  "If there is evidence to justify a
refusal to direct a verdict were the case before a jury, then there
is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal
quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not
undertake to re-weigh conflicting evidence, make credibility
determinations, or substitute its judgment for that of the [ALJ, as
adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal

4

brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-

---

[2] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

Case 1:21-cv-00196-WO-LPA   Document 18   Filed 08/17/22   Page 6 of 48

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

jobs available in the community," the claimant qualifies as disabled.  <u>Hines</u>, 453 F.3d at 567.[5]

## B.  Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ's decision violates *Mascio*[ *v. Colvin*, 780 F.3d 632 (4th Cir. 2015)]" (Docket Entry 14 at 4 (bold font omitted));

2) "[t]he ALJ failed to properly account for Plaintiff's limitations due to pain in the RFC" (<u>id.</u> at 6 (bold font and single-spacing omitted));

3)  "[t]he ALJ failed to evaluate obviously probative evidence when rendering the decision" (<u>id.</u> at 16 (bold font and single-spacing omitted));

4) "[t]he ALJ erred by failing to evaluate Listing 1.06" (<u>id.</u> at 18 (bold font omitted)); and

5) "[t]he structure of the SSA is constitutionally invalid" (<u>id.</u> at 19 (bold font omitted).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (Docket Entry 17 at 4-29.)

---

[5]  A claimant thus can establish disability via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

### 1. **Mascio**

Plaintiff's first issue on review argues that "[t]he ALJ's decision violates *Mascio*" (Docket Entry 14 at 4 (bold font omitted)), in that he "found that [Plaintiff] had moderate limitations in concentration, persistence or pace ('CPP')" (id. (citing Tr. 25-26)) but, when assessing the RFC, . . . only included the following mental limitation: '[Plaintiff] can perform unskilled work of a routine and repetitive nature'" (id. (quoting Tr. 26)). Plaintiff points out that the United States Court of Appeals for the Fourth Circuit in Mascio held that "'an ALJ does not account for a claimant's limitations in [CPP] by restricting the hypothetical question to simple, routine tasks or unskilled work,'" because "'the ability to perform simple tasks differs from the ability to stay on task[ and o]nly the latter limitation would account for a claimant's limitation in [CPP].'" (Id. at 5 (quoting Mascio, 780 F.3d at 638 (internal quotation marks omitted)).)

To support her position on this issue, Plaintiff notes that the ALJ "repeatedly stated that [Plaintiff]'s physical conditions resulting in pain would add to her distractibility, difficulty concentrating and difficulty completing tasks." (Id. at 6 (referencing Tr. 25-26, 29 30).) In Plaintiff's view, "the ALJ's decision must be vacated," because the "RFC includes no allowances for time off task, additional breaks or limitations in the pace or rate of work as would be implicated with [the ALJ's] admission that

9

[Plaintiff's] physical pain is going to cause issues with distractibility, concentrating and completing tasks." (Id. (citing Tr. 26).) According to Plaintiff, "the fact that [her] admitted issues with CPP resulting in distractibility[ and] difficulty concentrating and completing tasks are caused by physical discomfort as opposed to mental disorders renders th[e ALJ's] error [under Mascio] no less harmful." (Id. (citing Barnes v. Berryhill, No. 3:16CV46, 2017 WL 4171985, at *4-5 (W.D.N.C. Sept. 20, 2017) (unpublished)).) Those contentions lack merit.

The Fourth Circuit has indeed held that "the ability to perform simple tasks differs from the ability to stay on task," and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]." Mascio, 780 F.3d at 638. That court, however, also allowed for the possibility that an ALJ could adequately explain why the mental RFC in question sufficiently encompasses a moderate limitation in CPP:

> Perhaps the ALJ can explain why [the plaintiff's] moderate limitation in [CPP] at step three does not translate into a limitation in [her RFC]. For example, the ALJ may find that the [CPP] limitation does not affect [the plaintiff's] ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the [VE]. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted); see also Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (reaffirming Mascio's holding "that an ALJ cannot summarily account for a claimant's limitations in [CPP] by restricting the hypothetical question to simple, routine

10

tasks or unskilled work," but noting that Mascio "did not impose a categorical rule that requires an ALJ to always include moderate limitations in [CPP] as a specific limitation in the RFC" (internal quotation marks omitted)).

As a neighboring district court well explained:

> Mascio does not broadly dictate that a claimant's moderate impairment in [CPP] always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision . . . . An ALJ may account for a claimant's limitation with [CPP] by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015) (unpublished) (adopting magistrate judge's recommendation) (emphasis added). Here, the ALJ's decision provides a sufficient explanation as to why a limitation to "unskilled work of a routine and repetitive nature" (Tr. 26) sufficiently accounted for Plaintiff's moderate limitation in CPP (see Tr. 25).

First, the ALJ's rationale at step three of the SEP makes clear that, because of Plaintiff's "consistently . . . unremarkable" findings on mental status examinations (Tr. 26), the ALJ afforded Plaintiff's subjective complaints of physical pain the benefit of the doubt in finding a moderate limitation in CPP:

11

> With regard to [CPP], [Plaintiff] has a moderate
> limitation. <u>She allegedly struggles with concentration
> and task completion, but she attributes those issues
> largely to her physical discomfort</u>. . . . [S]he is able
> to sustain the concentration needed to accomplish daily
> activities such as shopping, driving, and managing her
> money. No doctor has recorded observations of cognitive
> abnormalities such as disorganized or tangential
> thoughts, distraction, or abnormal thought content.
> Instead, [Plaintiff]'s psychological presentation
> consistently has been unremarkable.

(Tr. 25-26 (emphasis added) (internal parenthetical citations omitted).)

Second, the ALJ's evaluation of the state agency psychological consultants's opinions additionally makes clear that the ALJ <u>primarily</u> based his moderate limitation in CPP on Plaintiff's subjective reports of distraction from <u>physical pain</u>. In that regard, the ALJ noted that the initial-level consultant found that, although Plaintiff's "mental impairments were moderately limiting," she nonetheless "could perform simple, routine, repetitive tasks [('SRRTs')]" (Tr. 30 (citing Tr. 74-75; <u>see also</u> Tr. 74 (containing initial-level consultant's opinion that Plaintiff "ha[d] intact attention for SRRTs")), and that the reconsideration-level consultant "opined that [Plaintiff]'s mental impairments caused no more than mild limitations, and therefore were nonsevere" (<u>id.</u> (citing Tr. 87)). The ALJ further explained that he found the initial-level consultant's opinion "more persuasive" than that of the reconsideration-level consultant, based on the following rationale:

12

It is true that [Plaintiff] does not participate in mental-health counseling, and that her psychological presentation in medical encounters has been normal. However, there is evidence that [Plaintiff] takes medication for symptoms of anxiety and depression. Additionally, she has indicated that physical discomfort can interfere with her concentration and ability to complete tasks. Both [] consultants discussed that evidence, but only [the initial-level consultant] accounted for it in her assessment. [That consultant]'s opinion therefore is more consistent with the evidence and is better supported.

(Tr. 30 (emphasis added) (internal parenthetical citations omitted).)

Third, the ALJ's analysis of Plaintiff's mental impairments and symptoms further elucidates the ALJ's reasoning in finding a moderate limitation in CPP based largely on Plaintiff's subjective complaints of distracting pain:

As for [Plaintiff]'s mental impairments, as stated earlier in the discussion of the [paragraph] B criteria [of Listings 12.04 and 12.06], there is relatively little evidence of mental dysfunction. [Plaintiff] takes medications to help symptoms of depression and anxiety. In physical examinations, depression and anxiety screens have been positive for only mild symptoms, and [Plaintiff] often has denied having mental symptoms. [Plaintiff] has interacted appropriately in examinations. She gets along with others, and she retains the ability to accomplish daily tasks such as making simple meals, driving, and managing her money, shopping for necessities, and keeping doctor appointments. Nevertheless, the [ALJ] finds that the record overall demonstrates that [Plaintiff]'s mental impairments are moderately limiting. This is because physical discomfort can add to the distractibility associated with depression and anxiety.

(Tr. 29 (emphasis added) (internal parenthetical citations omitted).) As emphasized above, the ALJ's observation that

13

Plaintiff remained able to engage in a variety of daily activities that require some degree of concentration and task persistence further underscores that the ALJ simply gave Plaintiff's complaints of distracting pain the benefit of the doubt in finding a moderate limitation in CPP. See Burger v. Colvin, No. 7:14CV190, 2015 WL 5347065, at *14 (W.D. Va. Sept. 14, 2015) (unpublished) (concluding ALJ explained why limitation to tasks involving short, simple instructions sufficiently accounted for the claimant's moderate limitation in CPP, where ALJ discussed pertinent record evidence, including the claimant's daily activities, and noting that "ALJ appeared to just give [the claimant] the benefit of the doubt regarding [the moderate] limitation" in CPP); see also Hicks v. Kijakazi, No. 1:20CV797, 2022 WL 344295, at *9 (M.D.N.C. Feb. 4, 2022) (unpublished) ("The ALJ [] gave [the p]laintiff the benefit of the doubt in taking her physical pain, as well as her mental symptoms, into account in finding her moderately limited in CPP and imposing restrictions to simple routine tasks with few changes in a routine work setting[.]" (first emphasis added) (internal quotation marks omitted)), recommendation adopted, slip op. (M.D.N.C. Mar. 18, 2022) (Osteen, J.); Adams v. Colvin, No. 1:15CV673, 2016 WL 4007608, at *8 (M.D.N.C. July 26, 2016) (unpublished) (holding that "ALJ's decision provide[d] a sufficient explanation as to why a limitation to unskilled work sufficiently accounted for [the p]laintiff's moderate limitation in CPP," where

14

ALJ credited state agency psychological consultant's opinion finding the plaintiff's "constraints primarily due to her <u>physical condition</u>," and "gave [the p]laintiff the <u>benefit of the doubt</u> by finding her depression severe and by finding she suffered moderate limitation in CPP" (emphasis added) (internal quotation marks and parenthetical citations omitted)), <u>recommendation adopted</u>, 2016 WL 6551324 (M.D.N.C. Nov. 10, 2016) (unpublished) (Osteen, C.J.).

Plaintiff contends that "the fact that [her] admitted issues with CPP resulting in distractibility[ and] difficulty concentrating and completing tasks are caused by physical discomfort as opposed to mental disorders renders th[e ALJ's <u>Mascio</u>] error no less harmful" (<u>id.</u> at 6 (citing <u>Barnes</u>, 2017 WL 4171985, at *4-5).) That argument, however, glosses over the fact that the ALJ adequately accounted under <u>Mascio</u> for Plaintiff's <u>physical pain-based</u> concentration difficulties by finding moderate limitation in CPP <u>and</u> by including physical limitations in the RFC, as recognized by a neighboring district court:

> [T]he ALJ assigned [the p]laintiff a moderate limitation in CPP at [s]tep [t]hree. But, in doing so, the ALJ attributed this moderate limitation in CPP to the pain [the p]laintiff feels from his *physical* impairments . . . . [T]he ALJ identified physical pain as the basis of [the p]laintiff's difficulties in CPP, and <u>he accounted for [the p]laintiff's physical pain in the RFC . . . [by including] sitting, standing, reaching, and other physical limitations as described in the RFC.</u> . . . . Therefore, <u>the ALJ adequately accounted for [the p]laintiff's physical limitations and pain in his RFC, and by doing so, also accounted for [the p]laintiff's limitations in CPP</u>.

15

Green v. Berryhill, No. 3:17CV482, 2019 WL 1331754, at *5 (W.D.N.C. Mar. 25, 2019) (unpublished) (italics in original) (underscoring added); see also Wilhelm v. Berryhill, No. 5:17CV138, 2018 WL 4705562, at *4 (W.D.N.C. Sept. 29, 2018) (unpublished) (holding that, where "ALJ found that [the p]laintiff's moderate difficulties in CPP were due to depression in combination with chronic pain[,] . . . [t]he ALJ accounted for [the p]laintiff's chronic pain in his RFC by requiring that [he] have a sit/stand option in work and the ability to change position twice per hour"). Similarly, the ALJ here not only included a limitation to "unskilled work of a routine and repetitive nature" in the RFC (Tr. 26), but also included limitations on lifting/carrying, climbing, and postural movements in the RFC to account for Plaintiff's pain (see Tr. 26), which (in turn) additionally addressed Plaintiff's primarily pain-based, moderate limitation in CPP.

In light of the foregoing analysis, Plaintiff's first assignment of error falls short.

## 2. Evaluation of Pain

Plaintiff's second assignment of error maintains that "[t]he ALJ failed to properly account for Plaintiff's limitations due to pain in the RFC." (Docket Entry 14 at 6 (bold font and single-spacing omitted).) In that regard, Plaintiff contends that, "[d]espite [her] testimony regarding very limited physical functioning [and] spending most of her day resting in a recliner or

16

in bed" (id. at 7; see also id. at 6-7 (describing such testimony (citing Tr. 47-53))), and evidence in "the record [which] shows that [she] suffers from several medical conditions which can reasonably cause the high, functionally limiting pain and fatigue levels of which she testified" (id. at 10; see also id. at 10-16 (detailing evidence Plaintiff believes reflects such levels of pain and fatigue (citing Tr. 313-14, 329-30, 336, 348, 397, 402-03, 473, 479, 557, 675, 701-03, 710-13, 816, 823-27, 849, 854, 858-59, 863-65, 867, 870-71, 901, 913-15, 929, 958, 961, 963-64, 984, 989, 991, 1010, 1051, 1055, 1057, 1067-68, 1070, 1075-76, 1109-1110, 1115, 1133-34, 1138, 1141-42, 1145))), the ALJ found that Plaintiff's "testimony was not fully supported by the evidence because[,] while she had several conditions which could reasonably result in pain and fatigue (and did) (RA, [fibromyalgia] and disc disease), her physical examinations [] did not reveal significant deficits in strength, gait, [and] reflexes or synovitis and she obtained good relief of her pain with trigger point injections and medications" (id. (citing Tr. 28)). Plaintiff contests both of those rationales by the ALJ (see id. at 7-10), arguing that 1) "the ALJ's reliance on a lack of strength, [and] gait or reflex type deficits does not detract from the supportability of [Plaintiff]'s limitations stemming from pain and fatigue, particularly with regards to her [fibromyalgia]" (id. at 7; see also id. at 7-8 (quoting Arakas v. Commissioner Soc. Sec. Admin., 983 F.3d 83, 97-98 (4th Cir. 2020),

17

for proposition "that ALJs may not rely on objective medical evidence (or lack thereof) - even as just one of multiple factors - to discount a claimant's subjective complaints regarding symptoms of fibromyalgia")), and 2) "the ALJ's argument that [Plaintiff]'s 'medication and trigger point injections [] provide[d] good pain relief' . . . is not factually accurate" (id. at 9 (quoting Tr. 28)). Plaintiff's contentions regarding the ALJ's improper reliance on objective medical evidence to discount Plaintiff's subjective complaints of fibromyalgia pain and fatigue in violation of Arakas have merit and warrant remand.

Approximately three months after the ALJ issued the decision under review, the Fourth Circuit decided Arakas in which it deemed fibromyalgia a "unique" disease, Arakas, 983 F.3d at 97, with "symptoms [that] are entirely subjective," id. at 96, and noted that "physical examinations of patients with fibromyalgia will usually yield normal results — a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions," id. (brackets omitted). The Fourth Circuit thus held that "ALJs may not rely on objective medical evidence (or the lack thereof) — even as just one of multiple medical factors — to discount a claimant's subjective complaints regarding symptoms of fibromyalgia," because "[o]bjective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's

18

fibromyalgia, based on the current medical understanding of the disease," id. at 97 (emphasis added).

Here, at step two of the SEP, the ALJ found that Plaintiff's fibromyalgia constituted a severe impairment, because it "significantly limit[ed her] ability to perform basic work activities" (Tr. 24), but found, at step three, that her fibromyalgia did not meet or medically equal the criteria of any of the Commissioner's listed impairments (see id.). As a result, the ALJ proceeded to determine Plaintiff's RFC and, as part of that analysis, evaluated Plaintiff's subjective symptom reporting. (See Tr. 26-29.) In that regard, the ALJ "f[ound] that [Plaintiff]'s medically determinable impairments [including fibromyalgia] could reasonably be expected to cause the alleged symptoms," but thereafter found that her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision." (Tr. 27 (emphasis added).) In support of that latter finding, the ALJ found that Plaintiff's "allegations of chronic pain accord with her reports to her doctors since the alleged onset date, and with her diagnoses of RA, fibromyalgia, and disc disease," but that "physical examinations have not revealed extreme deficits" (Tr. 28 (emphasis added), while also noting findings such as "stable and independent" gait (id.), "no active synovitis or swelling in her

19

joints" (id.), "good mobility, strength, and reflexes" (id.), "5/5 strength in all extremities" (id.), "5/5 grip strength" (id.), and "normal sensation and reflexes" (id.). The ALJ ultimately concluded as follow:

> In sum, the [ALJ] finds that [Plaintiff]'s subjective allegations and the objective medical evidence support a finding that her impairments cause some limitations in her ability to perform work-related activity. However, the [ALJ] further finds that the record as a whole – the medical evidence, the opinion evidence, and [Plaintiff]'s testimony – supports a finding that [she] retains the ability to perform work activity within the limitations described in the [RFC] assessment.

(Tr. 30 (emphasis added).)

As the ALJ analyzed Plaintiff's "RA, fibromyalgia, and disc disease" together (Tr. 28 (emphasis added)) and, in doing so, relied on objective medical evidence to discount Plaintiff's subjective symptom reporting (see id.; see also Tr. 30), the Court cannot rule out the possibility that the ALJ impermissibly relied on objective evidence, even as just one factor, in discounting the intensity, persistence, and limiting effects of Plaintiff's subjective complaints of fibromyalgia pain and fatigue in violation of Arakas. See Sandra P. v. Commissioner of Social Security, No. 2:21CV127, 2022 WL 815463, at *9 (E.D. Va. Mar. 1, 2022) (unpublished) (finding "Arakas prohibited" ALJ's reliance on "intact strength and a normal gait[]" in assessing the plaintiff's "complaints of pain related to her fibromyalgia"), recommendation adopted sub nom. Sandra P. v. Kijakazi, 2022 WL 811295 (E.D. Va.

Mar. 16, 2022) (unpublished); India G. v. Kijakazi, Civ. No. 20-1704, 2021 WL 3930430, at *1-2 (D. Md. Sept. 1, 2021) (unpublished) ("It is clear . . . that the ALJ used normal, objective evidence as a factor in discounting [the] plaintiff's subjective complaints about the limiting effects of her fibromyalgia. This is error after *Arakas*." (internal footnote and citation omitted)); Bryson v. Berryhill, No. 1:20CV169, 2021 WL 2517682, at *6 (W.D.N.C. June 18, 2021) (unpublished) ("[T]he ALJ erred when he applied the incorrect legal standard by considering objective evidence as a factor in evaluating [the p]laintiff's subjective symptoms of fibromyalgia, which essentially required [the p]laintiff to prove her subjective symptoms of fibromyalgia with objective evidence."); Midgett v. Saul, No. 2:19CV46, 2021 WL 1230188, at *3 (E.D.N.C. Mar. 31, 2021) (unpublished) ("[T]he ALJ's opinion [] suggests an improper reliance upon clinical findings to discredit fibromyalgia complaints, contrary to the direction in *Arakas*.").

Moreover, the ALJ's error under Arakas does not qualify as harmless under the circumstances presented here. As an initial matter, the Commissioner did not develop any argument in brief that the ALJ's consideration of objective evidence in his analysis of Plaintiff's fibromyalgia amounted to harmless error. (See Docket Entry 17 at 23-26.) More significantly, the Court cannot, on the record before it, conclude that remand for the ALJ's proper consideration of Plaintiff's alleged fibromyalgia pain and fatigue

under Arakas would not lead to a favorable outcome in Plaintiff's claim. As Plaintiff argues, "if [the ALJ] found [Plaintiff] capable of . . . sedentary exertion work, given her restriction to unskilled work, her inability to perform her [past relevant work] and her being over 50 years old throughout the [relevant time period], a finding of 'disabled' would be directed by the [Medical-Vocational Guidelines ('Grids')]." (Docket Entry 14 at 16 (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.14).) Such considerations warrant remand. See Sandra P., 2022 WL 815463, at *9 (declining to find Arakas error harmless and noting that, "[h]ad the ALJ found th[e fibromyalgia] evidence more persuasive in light of Arakas, and limited [the plaintiff] to only light work, it would eliminate the jobs identified by the VE[, and] . . . may have . . . resulted in a directed finding of disability under the [Grids]").[6]

Plaintiff also asserts that "the ALJ's argument that [Plaintiff]'s 'medication and trigger point injections [] provide[d] good pain relief' . . . is not factually accurate." (Docket Entry 14 at 9 (quoting Tr. 28).) In support of that assertion, Plaintiff notes that two of the record pages cited by the ALJ in support of that observation show only that Plaintiff

---

[6] Furthermore, although, for reasons that follow in the discussion below, the ALJ did not err in finding that Plaintiff's "trigger point injections [] provide[d] good pain relief" (Tr. 28), the Court cannot conclude that those "cervical injections" (Docket Entry 14 at 10 (emphasis added)) necessarily mitigated all of Plaintiff's fibromyalgia-related pain symptoms.

22

"tolerated the administration of the needle." (Id. at 10 (citing
Tr. 879 (1/30/20 trigger point injections), 991 (4/23/20 trigger
point injections)).) Plaintiff further points out that, although
she reported in May 2020 that "she obtained 70% relief from her
last trigger point injection" (id. (citing Tr. 1009)), her neck
pain "had already ramped back up to 7/10 in intensity, [and] was
described as 'constant' and worse with lifting, looking up, looking
down, turning her neck and activity in general" (id. (quoting Tr.
1010)). Additionally, Plaintiff asserts that the last page "to
which the ALJ refer[red] as showing . . . good pain relief from
treatment is actually the December 31, 2019 treatment note with
[Plaintiff]'s rheumatologist in which he explain[ed] that
[Plaintiff] had 'worsened' joint symptoms." (Id. (quoting Tr.
1051); see also id. (noting that, in March 2020, Plaintiff reported
that "nonsurgical care with Dr. [Harsh] Govil" had provided "'no
significant relief of her symptoms'" and rated her pain at 7/10
(quoting Tr. 859))). Plaintiff additionally observes that "her
cervical injections . . . did nothing to treat the pain from lumbar
radiculopathy, [fibromyalgia] and multiple fractures and avascular
necrosis in her hips." (Id.)

Plaintiff has failed to demonstrate prejudicial error arising
out of the ALJ's observation that Plaintiff's "pain [wa]s managed
conservatively, with medication and trigger point injections that
provide[d] good pain relief" (Tr. 28 (citing Tr. 879, 992, 1009,

23

1051)). As an initial matter, the ALJ did not err by citing to pages 879, 992, and 1009 of the administrative transcript in support of his "good pain relief" observation (id.), as those pages document the fact that Plaintiff received trigger point injections on two occasions (see Tr. 879, 992), as well as that, in May 2020, she "report[ed] 70% pain relief from the [trigger point injections] performed on [April 23, 2020]" (Tr. 1009; see also Tr. 50 (recording Plaintiff's testimony that injections in her neck gave her "relief"), 871 (containing Plaintiff's characterization of trigger point injections performed on October 30, 2019, as "helpful")). Regarding page 1051 of the transcript, although that page reflects "worsened [] joint symptoms," Plaintiff linked that worsening to the "recent lowering of [her] Methotrexate dose," which, as the ALJ observed, indicated that the "medication" Methotrexate had previously "provide[d] good pain relief" (Tr. 28). (See Tr. 1055 (documenting Plaintiff's report to rheumatologist Dr. Bilal Mufazzar on December 31, 2019, that "Methotrexate was helping her joints a lot but since [she had] been on the lower dose she ha[d] more pain" (emphasis added)); see also Tr. 329, 343, 354, 387, 397, 1129 (reflecting Plaintiff's statements to her providers that Soma, Methotrexate, Imuran, and prednisone helped to reduce her pain levels).)

In light of the foregoing analysis, Plaintiff's second assignment of error demonstrates prejudicial error under <u>Arakas</u>, establishing a basis for remand.

### 3. Failure to Evaluate Probative Evidence

Plaintiff next contends that "[t]he ALJ failed to evaluate obviously probative evidence when rendering the decision." (Docket Entry 14 at 16 (bold font and single-spacing omitted).) More specifically, Plaintiff faults the ALJ for 1) "fail[ing] to consider the statements by [treating physician] Dr. [Mahendra] Narendran that [Plaintiff] was unable to work due to her multiple comorbidities" (<u>id.</u> at 17 (citing Tr. 849, 866)), and 2) "fail[ing] to evaluate [orthopedic surgeon] Dr. [John Alex] Seldomridge's prescription of a walker for [Plaintiff]" (<u>id.</u> (citing Tr. 861)),[7] as well as orthopedic surgeon "Dr. [Harrison A.] Latimer's June 2020 directive that [Plaintiff] continue to use [a walker] due to her hip pain coming from the insufficiency fractures in her pubic region" (<u>id.</u> (citing Tr. 1115)). In Plaintiff's view, "[a]n ALJ's failure to consider material findings which contradict his reasons for denying a claim requires remand." (<u>Id.</u> (citing <u>Smith v. Saul</u>, No. 5:20CV45, 2021 WL 1145680, at *8 (E.D.N.C. Mar. 9, 2021) (unpublished), <u>recommendation adopted</u>, 2021 WL 1134588 (E.D.N.C.

---

[7] Although Plaintiff cited to page 861 of the administrative transcript regarding Dr. Seldomridge's prescription of a rolling walker (Docket Entry 14 at 17 (citing Tr. 861)), the notation of such a prescription actually appears on page 858 of the transcript (<u>see</u> Tr. 858; <u>see also</u> Tr. 984 (reiterating "[p]rescription for a rolling walker" at follow-up visit)).

Mar. 24, 2021) (unpublished)).) Plaintiff argues that "[t]he ALJ's failure to mention [the walker] was prescribed and his premature dismissing of [Plaintiff's] hip fracture as healing without mentioning the non-healing fractures both affected [the ALJ's] assessment that [Plaintiff] could perform the full range of light work standing and walking[ and] did not need a walker in the RFC." (Id. at 18.) Those arguments miss the mark.

The ALJ did not err by "fail[ing] to consider the statements by Dr. Narendran that [Plaintiff] was unable to work due to her multiple comorbidities" (id. at 17 (citing Tr. 849, 866)). The Commissioner's regulations (applicable to claims filed on or after March 27, 2017, such as Plaintiff's claim (see Tr. 156-59)) characterize "[s]tatements that [a claimant is] . . . not disabled[ or ] able to work," 20 C.F.R. § 404.1520b(c)(3)(i), as "inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled . . . under the Act," and do not require an ALJ to "provide any analysis about how [he or she] considered such evidence in [the ALJ's] determination or decision, 20 C.F.R. § 404.1520b (emphasis added).

Plaintiff's contentions regarding the ALJ's consideration of Plaintiff's alleged need for a walker fare no better. Although the ALJ discussed neither Dr. Seldomridge's prescription of the walker (see Tr. 858, 984), nor Dr. Latimer's "as needed" usage recommendation (Tr. 1115) (see Tr. 26-30), the ALJ did not

26

prejudicially err in that regard, because the record does not sufficiently establish the medical necessity of Plaintiff's walker. "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." Social Security Ruling 96-9p, Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a[n RFC] for Less Than a Full Range of Sedentary Work, 1996 WL 374185, at *7 (July 2, 1996) ("SSR 96-9p") (emphasis added). Moreover, "the legal issue does not turn on whether a cane was 'prescribed' . . . but whether a cane was 'medically required.'" Spaulding v. Astrue, 379 F. App'x 776, 780 (10th Cir. 2010).

Here, Dr. Seldomridge's records merely reflect that he prescribed the walker (see Tr. 858, 984), and Dr. Latimer's treatment record recommended only "as needed" usage of the walker (as well as only "as needed" follow-up with him) (Tr. 1115 (emphasis added)). Plaintiff's testimony similarly did not clarify the matter, as she stated only that she had used a rolling walker, prescribed by an orthopedic doctor, to assist her with walking and standing since March 2020, and did not indicate how frequently she used the walker (see Tr. 49). Moreover, the record evidence post-

27

dating the March 2020 walker prescription does not establish its medical necessity. Dr. Latimer documented only "<u>mild</u> pain with motion of [Plaintiff's] hips[,] well-maintained hip motion[,] and good strength'" at the same visit he recommended "as needed" walker usage (Tr. 1115 (emphasis added)), and Plaintiff advised Dr. Muzaffar just over one month later that her "[l]eft hip [wa]s not bothering her much" (Tr. 1130). None of the treatment records following the March 2020 prescription of the walker reflected that Plaintiff actually used the walker to attend those medical appointments. (<u>See</u> Tr. 849-57, 974-1041, 1104-1144.) Under such circumstances, the ALJ did not prejudicially err by failing to discuss the evidence in question regarding Plaintiff's walker.[8]

Furthermore, even assuming, <u>arquendo</u>, that the record adequately established the medical necessity of Plaintiff's walker, she still has not established prejudicial error. The ALJ stated as follows in his decision:

> Based on [Plaintiff]'s testimony regarding her hip pain
> and the medical evidence regarding her healing hairline
> fracture, the [ALJ] also asked the [VE] to identify any

---

[8] Plaintiff faults the ALJ for "wrongly assuming that [Plaintiff] only had one fracture in her hip which was noted to be healing on imaging" (Docket Entry 14 at 17 (citing Tr. 28-29)), and notes that her February 2020 MRI showed multiple fractures in her hip with only the inferior pelvic ramus fracture noted to be hearing," as well as that "pubic fractures were not noted to be healing and were surrounded by edema" (<u>id.</u> at 18 (citing Tr. 1143)). The ALJ's failure to expressly mention the pubic fractures in his discussion of Plaintiff's hip impairments (<u>see</u> Tr. 28-29) does not constitute prejudicial error because, as discussed above and below in the context of Plaintiff's fourth issue on review, the evidence following Plaintiff's hip fracture and walker prescription simply did not provide a sufficient basis for the ALJ to conclude that Plaintiff's hip impairment could be expected to last for a continuous period of at least 12 months, <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.06.

> jobs [Plaintiff] could perform assuming she required an
> assistive device to walk, in addition to all other
> limitations stated in the [RFC] assessment. The [VE]
> testified that the hypothetical individual could perform
> the job of clerical assistant ([Dictionary of
> Occupational Titles ('DOT')] 239.567-010, light,
> unskilled at [Specific Vocational Preparation ('SVP')]
> 2), with approximately 75,000 jobs in the national
> economy.

(Tr. 32.) Plaintiff neither cross-examined the VE regarding the
above-described testimony (see Tr. 56-57), nor challenged the ALJ's
above-quoted statement that, even with a walker, Plaintiff remained
able to perform the clerical assistant job (see Docket Entry 14).

Put simply, Plaintiff's third issue on review fails to
establish a basis for relief.

### 4. Listing 1.06

Via Plaintiff's fourth assignment of error, she asserts that
"[t]he ALJ erred by failing to evaluate Listing 1.06 [('[f]racture
of the femur, tibia, pelvis, or one or more of the tarsal
bones')]." (Docket Entry 14 at 18 (bold font omitted).) In that
regard, Plaintiff notes that "Listing 1.06 is met if the individual
suffered a fracture of the pelvis with solid union not eviden[t] on
medical imaging and an inability to ambulate effectively occurred
and a return to effective ambulation did not happen or was not
expected to happen within 12 months of onset" (id. (citing 20
C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.06)), as well as that "[t]he
use of a walker for ambulation constitutes an inability to ambulate
effectively" (id. (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1,

§ 1.00B2b)). According to Plaintiff, "[g]iven her reliance on a walker (which [wa]s prescribed for ongoing use) and the evidence of fractures which have not been noted as healing on imaging, Listing 1.06 is met[ and, a]t the very least, [] remand is warranted for an evaluation of the listing 'in the first instance.'" (Id. at 19 (quoting Radford v. Colvin, 734 F.3d 288, 296 (4th Cir. 2013)).)

"Under Step 3, the [SSA's SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii) (internal bracketed numbers omitted)). "The listings set out at 20 CFR pt. 404, subpt. P, App. 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted).

"In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990) (citing Zebley, 493 U.S. at 530, and 20 C.F.R. 404.1526(a)); see also Zebley, 493 U.S. at 530 ("An impairment that manifests only

30

some of those criteria [in a listing], no matter how severely, does not qualify."). "An impairment or combination of impairments medically equals a listing when it is at least equal in severity and duration to the criteria of any listed impairment." Grimes v. Colvin, No. 1:14CV891, 2016 WL 1312031, at *4 (M.D.N.C. Mar. 31, 2016) (unpublished) (Osteen, Jr., C.J.) (citing 20 C.F.R. § 416.926(a)-(b)) (emphasis added); see also Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) ("A finding of medical equivalence must be based on medical evidence only." (citing 20 C.F.R. § 404.1529(d)(3)) (emphasis added)). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of [her] unlisted impairment or combination of impairments is as severe as that of a listed impairment." Zebley, 493 U.S. at 531 (emphasis added).

"[O]nly where there is ample evidence in the record to support a determination that a claimant's impairment meets or equals one of the listed impairments must the ALJ identify the relevant listed impairments and compare them to evidence of a plaintiff's symptoms." Reynolds v. Astrue, No. 3:11CV49, 2012 WL 748668, at *4 (W.D.N.C. Mar. 8, 2012) (unpublished) (emphasis added) (citing Cook v. Heckler, 783 F.2d 1168, 1172-73 (4th Cir. 1986)); see also Russell v. Chater, No. 94-2371, 60 F.3d 824 (table), 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (unpublished) ("Cook,

however, does not establish an inflexible rule requiring an exhaustive point-by-point discussion [of listings] in all cases.").

To satisfy the criteria of Listing 1.06, Plaintiff must show that she suffered a "[f]racture of the . . . pelvis," "[w]ith[s]olid union not evident on appropriate medically acceptable imaging and not clinically solid," as well as "inability to ambulate effectively, as defined in [§] 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.06. In turn, the regulations define "[i]neffective ambulation" as "an extreme limitation of the ability to walk" and as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00B2b1 (emphasis added), i.e., "a walker, two crutches or two canes," id., § 1.00B2b2.

Here, as Plaintiff observed (see Docket Entry 14 at 19), the ALJ did not evaluate whether Plaintiff's hip fractures met or equaled the criteria of Listing 1.06 (see Tr. 24-26); however, that omission, if error at all, remains harmless error for two reasons, see generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion

32

unless there is reason to believe that the remand might lead to a different result").

First, as discussed above in connection with Plaintiff's third issue on review, the record does not establish the medical necessity of Plaintiff's walker and thus she has not established an "inability to ambulate effectively" as required by Listing 1.06, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.06. Second, the ALJ correctly found that Plaintiff had not sufficiently shown that her hip fractures, occurring in February 2020, could be expected to last a continuous period of at least 12 months:

> At the hearing, [Plaintiff] testified that she needs a walker to ambulate due to hip damage and hip pain. The record shows that in February 2020, [Plaintiff] developed hip pain after falling on her knees while rising from her couch. She was told that she had sustained a hairline fracture to her left hip that was very small and did not require surgery. By early March – a few weeks after the fracture was diagnosed – a magnetic resonance image (MRI) showed that the fracture was healing. The MRI revealed some necrosis of the femoral heads, but no edema. In physical examinations in June and July 2020, [Plaintiff] reported some pain with range of motion of her left hip; however, she demonstrated good hip motion and good hip strength, and no tenderness in the hip bursa. <u>The record provides no basis for concluding that the closed hairline fracture of [Plaintiff]'s hip will not continue to heal</u>.

(Tr. 28-29 (internal parenthetical citations omitted) (emphasis added).) Furthermore, as discussed above in the context of Plaintiff's third issue on review, the ALJ's failure to expressly acknowledge either Plaintiff's pubic fractures or the fact that Plaintiff's MRI did not reflect healing in those fractures (<u>see</u> Tr. 28-29), does not constitute prejudicial error, because the evidence

33

following Plaintiff's hip fracture and walker prescription simply did not provide a sufficient basis for the ALJ to conclude that Plaintiff's hip impairment could be expected to last for a continuous period of at least 12 months, see 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.06.

In sum, as Plaintiff has not pointed to "<u>ample</u> evidence in the record to support a determination that [her hip] impairment meets or equals [Listing 1.06]," <u>Reynolds</u>, 2012 WL 748668, at *4 (emphasis added), her fourth assignment of error falls short.

### 5. Constitutionality of SSA

In Plaintiff's fifth and final assignment of error, she contends that "[t]he structure of the SSA is constitutionally invalid." (Docket Entry 14 at 19 (bold font omitted).) Specifically, Plaintiff asserts that "[t]he United States Supreme Court has held that it is unconstitutional for an executive agency to be led by a single individual who serves for a longer term than the President and can only be removed from his position for cause." (<u>Id.</u> (citing <u>Seila Law LLC v. Consumer Fin. Prot. Bureau</u>, 591 U.S. __, ___, 140 S. Ct. 2183, 2197 (2020)).) According to Plaintiff, the "constitutionally invalid structure of the [Consumer Financial Protection Bureau ('CFPB')] is identical to that of the SSA," in that "[t]he Commissioner of SSA is the singular head of the [SSA], serves for a six-year term, and cannot be removed by the President except for cause ('neglect of duty or malfeasance in office')."

34

(Id. (quoting 42 U.S.C. § 902(a)(3)).) Plaintiff further maintains that "[t]he ALJ's delegation of authority in this case came from [then-Commissioner Andrew] Saul and is therefore constitutionally defective" (id. at 20 (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-0-2(A))), as well as that "the ALJ decided this case under regulations promulgated by [then-Commissioner] Saul when [he] had no constitutional authority to issue those rules" (id.). In Plaintiff's view, "the ALJ's decision must [] be vacated because he did not have the authority to decide the case given the delegation of authority from [then-]Commissioner [Saul] who ha[d] no constitutional authority to head the [SSA]." (Id.) Those arguments ultimately fail as a matter of law.

As an initial matter, the Commissioner concedes "that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (Docket Entry 17 at 4 (citing U.S. Dep't of Justice ("DOJ"), Office of Legal Counsel, "Constitutionality of the Commissioner of Social Security's Tenure Protection," 2021 WL 2981542 (July 8, 2021) ("2021 OLC Op")).) However, the Commissioner notes that, "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused her harm." (Id. at 4-5 (citing Collins v. Yellen, ___ U.S. ___, ___ - ___, 141 S. Ct. 1761, 1787-89 (2021)).)

35

According to the Commissioner, Plaintiff's separation of powers argument fails because 1) "the ALJ who issued the final decision denying Plaintiff's claim was not appointed by a Commissioner subject to Section 902(a)(3)'s removal restriction[, but r]ather, the ALJ had his appointment ratified by an *Acting* Commissioner of Social Security – whom the President could have removed from that role at will, at any time," and 2) Plaintiff cannot "show that Section 902(a)(3)'s removal restriction caused the denial of her benefits claim." (Id. at 5 (emphasis supplied by Commissioner).) For the reasons that follow, the Commissioner's argument has merit.

a.   Acting Commissioner Removable at Will

The Commissioner offers the following argument regarding the President's power to remove an Acting Commissioner of the SSA at will:

> The ALJ who adjudicated Plaintiff's claim on September 16, 2020 held office under an appointment legally ratified in July 2018 by then-Acting Commissioner [Nancy] Berryhill. For her part, Ms. Berryhill had been designated to serve as Acting Commissioner in April 2018, upon former President Trump's nomination of Andrew Saul to serve as Commissioner.[FN*] In her Acting capacity, she enjoyed no statutory tenure protection. *See* 42 U.S.C. § 902(b)(4); *Collins*, 141 S. Ct. at 1783 ("[W]e generally presume that the President holds the power to remove at will executive officers and that a statute must contain plain language to take [that power] away."); *see also United States v. Eaton*, 169 U.S. 331, 343 (1898) (holding that where a "subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official"); *accord Collins*, 141 S. Ct. at 1782 (FHFA Acting Director removable at will because relevant "subsection does not include any removal restriction.

Nor does it cross-reference the earlier restriction on the removal of a confirmed Director.").[FN**] Thus, Ms. Berryhill was removable at will, and her ratification of the deciding ALJ's appointment accordingly severed any conceivable nexus between Section 902(a)(3)'s tenure protection for a confirmed Commissioner and any alleged harm to Plaintiff.

[FN*] Under the Federal Vacancies Reform Act (FVRA), 5 U.S.C. § 3346(a)(1), even if Ms. Berryhill's initial eligibility to serve as Acting Commissioner previously expired, then-President Trump nominated Andrew Saul for Commissioner in April 2018, such that Ms. Berryhill once again was eligible to serve as Acting Commissioner. The FVRA "incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the submission of a nomination, even if the 210-day period expired before that nomination was submitted." 23 O.L.C 60, 68 (1999), 1999 WL 1262050, at *8. That provision establishes a new period of acting service following a first or second nomination for the office. *See* 5 U.S.C. § 3346(a)(2), (b). Ms. Berryhill's eligibility following Mr. Saul's nomination was, therefore, valid — and it remained in force on July 16, 2018, the date [Acting Commissioner] Berryhill ratified the appointments of the [SSA]'s ALJs, including the ALJ who later adjudicated Plaintiff's claim. *See* Social Security Ruling [] 19-1p[, *Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council*, 2019 WL 1324866 (Mar. 15, 2019)].

[FN**] The [] Act describes the "Commissioner of Social Security" as an individual "appointed by the President" and confirmed by the Senate. 42 U.S.C. § 902(a). The Commissioner is appointed to a term of six years, and "[a]n individual serving in the office of Commissioner may be removed from office" only for cause. 42 U.S.C. §902(a)(3). In a separate subsection, the statute addresses the "Deputy Commissioner of Social Security," who enjoys no removal protection, and is deemed the "Acting Commissioner" during the "absence or disability of the Commissioner . . . unless the President designates another officer of the Government as Acting Commissioner." 42 U.S.C. § 902(b)(2), (4)[; c]ompare, 42 U.S.C. § 902(c)(1) (providing that the Chief Actuary is removable only for cause). In the absence of plain statutory text providing tenure to an Acting Commissioner

37

— which would be "a singular anomaly in all of administrative law," *Rop v. Fed. Hous. Fin. Agency*, 485 F. Supp. 3d 900, 938 (W.D. Mich. 2020) — a person serving temporarily in an Acting capacity is removable at will. *See Collins*, 141 S. Ct. at 1783 ("[W]e generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that power] away.'"); *accord Swan v. Clinton*, 100 F.3d 973, 987 (D.C. Cir. 1996) (holding removal protection did not apply to "holdover" officials since "if the President cannot remove holdover officials . . . then holdover members could conceivably remain in office for substantial, indeed unlimited, periods of time").

(Docket Entry 17 at 7-9 (stray quotation mark omitted).)[9]

The statutory language of Section 902 supports the Commissioner's position for three reasons. To begin, comparison of the language in the portion of Section 902 authorizing the Commissioner with the portion authorizing the Deputy Commissioner (who serves as <u>Acting</u> Commissioner in the Commissioner's absence, disability, or vacancy) supports the Acting Commissioner's position that the President can remove an Acting Commissioner at will. The applicable portion of that statute provides as follows:

(a) Commissioner of Social Security

(1) There shall be . . . a Commissioner of Social Security . . . who shall be appointed by the President, by and with the advice and consent of the Senate.

. . .

(3) The Commissioner shall be appointed for a term of 6 years . . . . <u>An individual serving in the office of Commissioner may be removed from office only pursuant to</u>

---

[9] Plaintiff did not Reply. (<u>See</u> Docket Entries dated Dec. 21, 2021, to present.)

<u>a finding by the President of neglect of duty or
malfeasance in office</u>.

. . .

(b) Deputy Commissioner of Social Security

(1) There shall be . . . a Deputy Commissioner of Social
Security . . . who shall be appointed by the President,
by and with the advice and consent of the Senate.

(2) The Deputy Commissioner shall be appointed for a term
of 6 years . . . . In any case in which a successor does
not take office at the end of a Deputy Commissioner's
term of office, such Deputy Commissioner may continue in
office until the entry upon office of such a successor.
A Deputy Commissioner appointed to a term of office after
the commencement of such term may serve under such
appointment only for the remainder of such term.

. . .

(4) The Deputy Commissioner shall perform such duties and
exercise such powers as the Commissioner shall from time
to time assign or delegate. <u>The Deputy Commissioner
shall be Acting Commissioner of the Administration during
the absence or disability of the Commissioner and, unless
the President designates another officer of the
Government as Acting Commissioner, in the event of a
vacancy in the office of the Commissioner</u>.

42 U.S.C. § 902 (emphasis added). Thus, although the portion of

Section 902 governing the Commissioner includes an express removal

for cause provision, <u>see</u> 42 U.S.C. § 902(a)(3), the corresponding

provision in the portion of Section 902 involving the Deputy

Commissioner lacks any such language, <u>see</u> 42 U.S.C. § 902(b)(2).

Notably, the Supreme Court has cautioned that a statute must

<u>expressly</u> place limits on the President's authority to remove

executive agency heads at will. <u>See</u> <u>Collins</u>, ___ U.S. at ___, 141

S. Ct. at 1783 ("[W]e generally presume that the President holds

39

the power to remove at will executive officers and that a statute must contain plain language to take [that power] away." (internal quotation marks omitted)).

Second, the removal provision explicitly applies only to "[a]n individual serving in the office of Commissioner," 42 U.S.C. 902(a)(3) (emphasis added). Thus, by its very terms, Section 902(a)(3)'s removal provision does not apply to an individual serving in the office of the Acting Commissioner.

Third, Section 902(b)(4) expressly accords the President the power to "designate[] another officer of the Government as Acting Commissioner" other than the Deputy Commissioner in the event of a vacancy in the office of Commissioner. 42 U.S.C. § 902(b)(4) (emphasis added). That broad authority to designate any other "officer of the Government" as Acting Commissioner during a vacancy further supports the view that the removal restriction applicable to the office of Commissioner does not apply in the same manner to the office of Acting Commissioner.

Moreover, cases addressing the merits of Seila Law/Collins claims have found that Section 902(a)(3) does not limit the authority of the President to remove an Acting Commissioner, and that then-Acting Commissioner Berryhill's appointment of the deciding ALJ precluded any possible link between Section 902(a)(3)'s unconstitutional removal provision and any alleged harm to the plaintiff. See, e.g., Harris v. Kijakazi, No. 21-1853, 2022

WL 2987928, at *3 (4th Cir. July 28, 2022) (unpublished) (rejecting the plaintiff's Seila Law/Collins claim because, "when the ALJ issued her decision, the SSA was headed by an Acting Commissioner, who was not subject to any statutory tenure protection"); Standifird v. Kijakazi, No. 20CV1630, 2021 WL 5634177, at *4 (S.D. Cal. Dec. 1, 2021) (unpublished) ("Because an Acting Commissioner does not have the same removal restriction as the Commissioner and because [the] ALJ [] was properly appointed, [the p]laintiff's argument is not persuasive . . . ."), recommendation adopted, 2022 WL 970741 (S.D. Cal. Mar. 31, 2022) (unpublished); Alice T. v. Kijakazi, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021) (unpublished) ("[T]he ALJ's decision in this case was issued on July 17, 2019, one month after [then-Commissioner Andrew] Saul took office. The ALJ who decided [the p]laintiff's case was appointed by then-Acting Commissioner [Nancy] Berryhill, who could be removed from that office at the President's discretion."); Lisa Y. v. Commissioner of Soc. Sec., 570 F. Supp. 3d 993, 1001 n.1 (W.D. Wash. 2021) ("[The Commissioner] correctly contends [that Nancy] Berryhill, as Acting Commissioner, was properly appointed and not subject to § 902's removal clause."); Boger v. Kijakazi, No. 1:20CV331, 2021 WL 5023141, at *3 (W.D.N.C. Oct. 28, 2021) (unpublished) ("Indeed, [the p]laintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the] ALJ [in question] was appointed by an Acting

41

Commissioner of Social Security who could be removed from that office at the President's discretion." (citing 42 U.S.C. § 902(b)(4), Collins, ___ U.S. at ___, 141 S. Ct. at 1783, and Eaton, 169 U.S. at 343)); see also Fish v. Kijakazi, No. 5:21cv182, 2022 WL 1504887, at *6 (N.D.W. Va. Apr. 26, 2022) (unpublished) ("Courts across the country have uniformly concluded that the allegedly unconstitutional nature of 42 U.S.C. § 902(a)(3) does not require remand." (citing cases)), recommendation adopted, 2022 WL 1498115 (N.D.W. Va. May 11, 2022) (unpublished).

Thus, because then-Acting Commissioner Nancy Berryhill appointed the ALJ who issued the decision denying Plaintiff's claims, and the President may remove Acting Commissioners at will, Plaintiff's challenge under Seila Law/Collins fails.

b.   Impact on ALJ's Decision

Next, the Commissioner maintains that, even if Acting Commissioners remained subject to Section 903(a)(3)'s removal for cause provision, Plaintiff's Seila Law/Collins argument would still fall short, because she did not demonstrate any actual harm arising from Section 902(a)(3)'s unconstitutional removal provision. (See Docket Entry 17 at 10-14.)   In that regard, the Commissioner asserts that:

> [U]nlike Appointments Clause defects, where the presiding official does not enjoy proper authority to occupy the office, see Lucia v. SEC, 138 S. Ct. 2044 (2018), agency action is not per se invalid simply because it can be traced back to an official subject to an unconstitutional removal protection.   Rather, under Collins, where an

42

agency official is properly appointed, there can be no claim that he "exercise[d] . . . power that [he] did not lawfully possess." *Collins*, 141 S. Ct. at 1788; *see also id.* at 1788 n.23 ("the unlawfulness of [a] removal provision does not strip [an official] of the power to undertake the other responsibilities of his office"). Thus, "there is no reason to regard *any* of the actions taken" by officials with tenure protection during this period "as void." *Id.* at 1787 (emphasis added); *see also id.* at 1793 (Thomas, J., concurring) (where officials were properly appointed, there is "no barrier to them exercising power").

*Collins* teaches, therefore, that actions taken by properly appointed officials are not void. Regardless of the restrictions on removal, the properly appointed Commissioner had full authority to carry out the responsibilities of his office, including promulgating regulations and delegating authority pursuant to the [] Act. . . .

[R]elief is available in removal challenges only where the alleged injuries are caused by officials subject to the challenged removal restrictions, *and* where those restrictions themselves "inflicted compensable harm" upon plaintiffs. [*Id.*] at 1789. . . . To obtain a rehearing on separation of powers grounds, in other words, Plaintiff must show that Section 902(a)(3)'s removal restriction somehow caused the denial of her benefits claim.

(Docket Entry 17 at 10-12 (stray space and some internal bracketed material omitted).)[10]

Unlike Appointments Clause cases, where courts have found the very authority under which a government official has acted unconstitutional, see, e.g., Carr v. Saul, ___ U.S. ___, ___, 141 S. Ct. 1352, 1356-62 (2021); Probst v. Saul, 980 F.3d 1015, 1023 (4th Cir. 2020), the unconstitutional removal provision at issue

---

[10] Plaintiff did not Reply. (See Docket Entries dated Dec. 21, 2021, to present.)

here did <u>not</u> impact then-Commissioner Saul's ability to carry out

the duties of his office.  As another court recently explained:

> [The p]laintiff's argument is similar to arguments the
> plaintiffs raised and the [United States Supreme] Court
> rejected in <u>Seila Law</u> and <u>Collins</u>.  First, like the
> plaintiffs in <u>Seila Law</u>, [the p]laintiff here argues
> § 902(a)(3)'s removal provision automatically renders all
> agency action unconstitutional.  The [Supreme] Court in
> <u>Seila Law</u> rejected such an argument[,] observing one
> section of a statute may violate the Constitution without
> rendering the entire act void.  <u>Seila Law</u>, 140 S. Ct. at
> 2209.  The [Supreme] Court stated the removal limitation
> of the CFPB Director is the only defect and removal of
> the defect removes the constitutional violation.  The
> [Supreme] Court concluded the removal limitation was
> severable because the CFPB is capable of functioning
> independently of the infirm removal clause.  <u>Id.</u> [] ("The
> provisions of the Dodd-Frank Act bearing on the CFPB's
> structure and duties remain fully operative without the
> offending tenure restriction.  Those provisions are
> capable of functioning independently, and there is
> nothing in the text or history of the Dodd-Frank Act that
> demonstrates Congress would have preferred no CFPB to a
> CFPB supervised by the President."); <u>see also</u> [<u>id.</u>] at
> 2245.
>
> . . .
>
> The Supreme Court in <u>Collins</u> also rejected the argument
> an invalid removal provision rendered the FHFA's actions
> void from the outset.  The Supreme Court stated there was
> "no reason to hold that the third amendment [to the
> agreement between the FHFA and the Department of
> Treasury] must be completely undone." <u>Collins</u>, [141 S.
> Ct.] at 1788.  The <u>Collins</u> Court further stated
> "[a]lthough the statute unconstitutionally limited the
> President's authority to remove the confirmed Directors,
> there was no constitutional defect in the statutorily
> prescribed method of appointment to that office.  As a
> result, there is no reason to regard any of the actions
> taken by the FHFA [challenged on appeal] as void." [<u>Id.</u>]
> at 1787.  Accordingly, the argument the SSA's actions
> here are either void *ab initio* or became void at some
> later point due to § 902(a)(3)'s removal clause is not
> supported by either <u>Seila Law</u> or <u>Collins</u>.

Lisa Y., 570 F. Supp. 3d at 1002-03 (internal footnote, citation, and stray parenthesis and period omitted); see also Robinson v. Kijakazi, No. 1:20CV358, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021) (unpublished) ([The p]laintiff . . . offers no evidence to show that there is a nexus between the unconstitutional removal restriction and the denial of his application for disability benefits[ and ] simply argues that all actions taken by the Commissioner are void due to the unconstitutional removal provision. However, Collins expressly rejects this view." (internal citation omitted)), appeal filed, No. 21-2258 (4th Cir. Nov. 9, 2021).

Some decisions have allowed claims of the sort raised here to proceed in the face of standing challenges. See Dixie C. v. Kijakazi, No. 3:21CV764, 2021 WL 4822838, at *6 (N.D. Tex. Sept. 20, 2021) (unpublished) ("[B]ecause [the p]laintiff has established both traceability and redressability for the purposes of standing, the [c]ourt has standing to hear [the p]laintiff's constitutional claim." (emphasis added)), recommendation adopted, 2021 WL 4820764 (N.D. Tex. Oct. 15, 2021) (unpublished); Sylvia A. v. Kijakazi, No. 5:21cv76, 2021 WL 4692293, at *4 (N.D. Tex. Sept. 13, 2021) (unpublished) ("The [c]ourt finds that [the p]laintiff's separation-of-powers claim is both traceable and redressable such that she has standing to pursue it. Thus, all of [the p]laintiff's claims should proceed to briefing on the merits." (emphasis

added)), <u>recommendation adopted</u>, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021) (unpublished); <u>Albert v. Kijakazi</u>, No. 1:21CV4, 2021 WL 3424268, at *5 (D. Alaska Aug. 5, 2021) (unpublished) ("Because [the] plaintiff has <u>standing</u> to bring his constitutional claim, [the Commissioner]'s motion to dismiss is denied." (emphasis added)); <u>Tafoya v. Kijakazi</u>, 551 F. Supp. 3d 1054, 1059 (D. Colo. 2021) ("While ultimately, the righteousness *vel non* of [the plaintiff's] arguments on the merits may gain [her] little, if anything, the question presently before [the court] is one of <u>standing</u>, and thus does not implicate the merits." (footnote omitted) (emphasis added)).[11]

---

[11] Cases exist to the contrary on the standing issue. <u>See</u> <u>Helms v. Commissioner of Soc. Sec.</u>, No. 3:20CV589, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021) (unpublished) ("The [c]ourt finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected [the] ALJ[ ]'s decision or any other aspect of the administrative litigation in a material way. Because [the] plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality."); <u>Catherine J.S.W. v. Commissioner of Soc. Sec.</u>, No. 3:20CV5602, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021) (unpublished) ("Because [the p]laintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner [Andrew] Saul, . . . the [p]laintiff's situation is distinguishable from the plaintiff's claims in <u>Collins</u>; [the p]laintiff has failed to establish standing . . . ."); <u>Amanda B. v. Commissioner, Soc. Sec. Admin.</u>, No. 3:20CV434, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021) (unpublished) ("[The p]laintiff . . . does not allege the SSA Commissioner took any action that is in any way related to the ALJ's decision or the decision by the Appeals Council."), <u>appeal filed</u>, No. 21-36014 (9th Cir. Dec. 9, 2021); <u>Brinkman v. Kijakazi</u>, No. 2:21CV528, 2021 WL 4462897, at *2 (D. Nev. Sept. 29, 2021) (unpublished) ("Because [the p]laintiff offers nothing that traces the decision by the ALJ . . . to any alleged injurious conduct by the SSA Commissioner, [the plaintiff] has not demonstrated traceability and her constitutional violation claim fails for lack of standing."); <u>see also</u> <u>Drye v. Kijakazi</u>, No. 1:21CV135, 2022 WL 1446672, at *7 & n.1 (W.D.N.C. May 6, 2022) (unpublished) (rejecting "remand based on [separation of powers] constitutional argument" because "[the p]laintiff lacks standing" and observing that "many [courts] have repeatedly rejected Social Security plaintiffs' claims that ALJ's decisions are constitutionally defective based on a separation of powers argument" (citing cases)).

However, even courts among that number have expressed doubt that the plaintiffs' Collins-based claims could succeed on the merits:

> The outcome of Collins is even less auspicious for [the] plaintiff's substantive claim. The [Supreme] Court there rejected the appellant's argument that the actions of the Director of the FHFA of which appellant complained were void:
>
>> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.
>
> Collins, 141 S. Ct. at 1787 (emphases in original). Accordingly, "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office," including implementing the provision of which the appellant complained. Id. at 1788 n.23. It thus may well be that, even if the removal provisions of the [] Act are unconstitutional, the [SSA]'s ALJs still had authority to issue disability determinations.

Tafoya, 551 F. Supp. 3d at 1059 n.6; see also Dante v. Saul, Civ. No. 20-702, 2021 WL 2936576, at *5 (D.N.M. July 13, 2021) (unpublished) ("Th[e] rationale [in Collins] appears to undermine [the p]laintiff's position that the Commissioner acted outside his constitutional authority when he delegated authority to the ALJ to decide [the p]laintiff's disability claim. But, curiously, the [Supreme] Court's analysis in Collins also supports a finding that [the p]laintiff has standing to assert a constitutional claim under this now-questionable theory." (italics omitted, underscoring

47

added)).  In sum, cases decided in the <u>standing</u> context do not provide a basis for the Court to find actual harm to Plaintiff arising from Section 902(a)(3)'s removal provision.

In light of the foregoing analysis, Plaintiff's fifth and final assignment of error does not entitle her to relief.

### III.  CONCLUSION

Plaintiff has established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated, and that this matter be remanded under sentence four of 42 U.S.C. 405(g) for further administrative proceedings, to include re-evaluation of Plaintiff's subjective reports of fibromyalgia symptoms in compliance with <u>Arakas</u>.  As a result, Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 13) should be granted, and Defendant's Motion for Judgment on the Pleadings (Docket Entry 16) should be denied.


                              /s/ L. Patrick Auld
                            **L. Patrick Auld**
                    **United States Magistrate Judge**

August 17, 2022